JOEL M. WOMACK vs. ROBERT AUSTIN, EX'OR, AND OTHERS.

W., an infant, was entitled to a considerable estate under his father's will, and
A. was executor of the will, and since the father's death, a period of be-
tween five and six years, had acted as W.'s guardian. Three days after W.
arrived at age, A. turned over to him certain securities of which, as he rep-
resented, the estate then consisted, and took from him a release, drawn by
A.'s agent, from further liability. There was no actual fraud, but W. acted
without advice, and various matters relative to the value of the securities,
A.'s duties in the discharge of his trust and W's. legal rights, which it was im-
portant to W. that he should know before executing the release, were not
disclosed: *Held*, That it was A.'s duty, under the circumstances, to make
the disclosure, and, principally because he had failed to do so, the release
was set aside.

It is not necessary to show actual fraud in order to invalidate a release given
by a ward to his guardian shortly after the arrival of the former at age.

To obtain the reversal of a Circuit decree, upon a question of fact merely, it
must be shown that the overbearing force of the evidence is against the
decree.

Where the instrument creating the trust designates the securities in which
the investments should be made, the trustee will not be excused, except in
case of a controlling necessity, for investing in other kinds of securities.

The will directed the moneys of the estate to be invested by the executor "in
some safe public securities, in the stocks of the city of Charleston or of the
State of South Carolina:" *Held*, That the stocks designated were those of
the city in its corporate capacity, and those created immediately and di-
rectly by the State, and that the executor was liable for investments, made
in 1861, in the stocks of incorporated Banks, and, in 1863, in bonds of the Con-
federate States.

*Held, further*, That the executor was liable for investments made in 1863 in per-
sonal securities.

BEFORE CARROLL, CH., AT CHARLESTON, FEBRUARY, 1868.

The object of the bill in this case was to set aside a release given
on the 6th February, 1866, by the plaintiff, Womack, to the de-
fendant, Austin, and to compel the defendants to account for the
estate of the plaintiff's father, which came to the hands of his exe-
cutors.

From the pleadings and the evidence, it appeared, that John B.
Womack, the plaintiff's father, and the testator in the cause, died
on the 30th June, 1861, leaving a considerable estate, and also
leaving a last will and testament, whereby he bequeathed his estate
in such manner that, within a year after his death, the whole be-
came vested in the plaintiff, his only child, as sole legatee thereof.
The defendant, Austin, W. W. Wilbur, deceased, and the plaintiff,
were nominated executors, and the will directed, *inter alia*, as fol-
lows: "After my just debts and funeral expenses are paid, I direct
that all my real and personal estate, which I may be seized and pos-
sessed of at the time of my death, be sold to the best advantage, and
the proceeds, together with the money and choses in action then in my

possession, or to which I may be entitled, be invested in some safe public securities, in the stocks of the City of Charleston, or of the State of South Carolina, by my executors." The will was dated on the 25th June, 1860, and the plaintiff was, at that time, between fifteen and sixteen years of age. On the 3d day of July, 1861, the will was proved before the Ordinary of Charleston District, by W. W. Wilbur and the defendant, and they assumed the execution thereof. Wilbur died some four months afterwards, leaving a will, by which he appointed the defendants, T. A. Wilbur and M. B. Wilbur, executors.

In September, 1861, the executors invested moneys of the estate then on hand, in the purchase of 225 shares of the stock of the People's Bank of Charleston, and 19 shares of the Planters' and Mechanics' Bank; and, in 1863, Austin invested $3,000 in 8 per cent. bonds of the Confederate States. He also loaned $3,000, on the 15th May, 1863, to Lewis Cannon, on bond and mortgage, and $6,000, on the 29th October, of the same year, to T. S. Heyward, taking his note for the same, with Nathaniel Heyward as surety.

Austin took charge of the education and maintenance of the plaintiff soon after his father's death, and acted as his guardian during his minority. He arrived at age on the 3d February, 1866, and, two days after, (February 5th,) he and Austin went to the office of Mr. Buist, Ordinary of Charleston District, to have a settlement. No one was present but Mr. Buist and themselves. At this interview, which lasted about one hour, not much was done. On the next day, (February 6th,) the plaintiff returned to the office of Mr. Buist, and there, in the absence of Austin, who had gone into the country, he executed a paper, under seal, which Mr. Buist had drawn, by which he acknowledged the receipt, "from Robert Austin, surviving executor of John B. Womack," of the bank stock, Confederate bonds, bond and mortgage of Cannon, and note of Heyward, above mentioned, and some other securities. The conclusion of this paper is as follows: "The balance of $1,096.08, in Confederate States notes, due said executor, as appears in his annual accounts to Ordinary's Court, he cancels and releases all claims to same in favor of legatee. The enumerated assets constitute the entire estate of said John B. Womack, principal and income, and is now received by me, under provisions of testator's will, having arrived at legal age, to wit: twenty-one years and three days, in full payment and settlement of my entire claim as legatee; and I do hereby release and discharge said executor from all further claims

and liability for or on account of any right or interest I may have in said estate." The stocks and securities were then turned over by Mr. Buist to the plaintiff.

The plaintiff soon became dissatisfied with the settlement he had made. On the 15th February, 1866, he returned to Mr. Buist's office, and demanded of him the release he had executed, offering, at the same time, to return all the papers he had received. This was declined, and, not long afterwards, the bill in this case was filed.

The questions made in the case were: (1) As to the validity of the release; and (2) whether the investments in bank stock, Confederate States bonds, and the other securities named, could be sustained. Evidence was given, upon both points, which will be found sufficiently stated in the Circuit decree and judgment of this Court.

The decree is as follows:

CARROLL, Ch. When an infant has but very recently attained to his majority, all acts on his part which confer a substantial bounty or advantage upon his late guardian are viewed by this Court with a jealousy almost invincible. In the absence of further evidence, the presumption arises that they were procured by undue influence exerted by the party benefitted. To sustain such a transaction, it must appear, affirmatively, that it was the deliberate act of the late ward, after being fully informed of his rights and interests.—1 Story, § 317 ; *Hylton* vs. *Hylton*, 2 Ves., 548 ; *Huguenin* vs. *Basely*, 3 Lead. Eq. Cases and Notes. It is not deemed material whether the defendant be regarded as the testamentary guardian of the plaintiff, or the executor of his father's will. He had in his custody the plaintiff's entire estate ; had assumed the trust of his maintenance and education, and stood towards him in such fiduciary relation as subjects his dealings with the plaintiff to the rules and principles adverted to. Within three days after attaining his majority, the plaintiff effected a settlement, with the defendant, of his accounts, as such executor and guardian, and executed a full release of all claims against him in that behalf.

There is no sufficient evidence to sustain the charges against Austin of actual fraud and circumvention. His accounts, as executor, seem to have been rendered annually and regularly. The settlement between himself and the plaintiff occurred in the office and presence of the Ordinary. It is in evidence, that, upon that occasion, the package of papers connected with his father's estate was

produced, and the plaintiff invited to ask such explanations as he desired of any items or particulars of the accounts. The testimony of Mr. Buist is, that he declined to do so, remarking that he had seen the papers before, Austin having frequently shown them to him. Prior to their settlement, the plaintiff seems to have been apprized of the more important acts of Austin in the administration of his testator's estate. Before that date, as he admits in his testimony, he knew of Austin's investment in bank stocks and the bonds of the late Confederate States of America, in the note of T. S. & N. Heyward, and the bond of Lewis Cannon, as, also, that the Confederate bonds referred to had become utterly worthless. The accounting and settlement between the parties, though agreed upon, was not completed on the day it began. It was on the succeeding day that the plaintiff received the papers and securities representing the assets of his father's estate, and it was then that he executed the release to Austin. But, meanwhile, the latter had left the city, returning to his residence, and the release in question was executed in his absence, and was delivered to the Ordinary for him.

There are circumstances, also, which seem to indicate that, in reality, Austin had less of personal influence over his ward than usually results from that relation. At his father's death, the plaintiff was a cadet in the Military Academy of the State, and was afterwards a soldier in the army of the Confederate States until the close of the war. During this period, as it may be inferred, there could not have been much personal intercourse between him and his guardian. The plaintiff is educated and intelligent, and seems to be possessed of more than ordinary self-reliance and firmness of character. Yet, all this may well consist with his having had great trust and confidence in the defendant, and with the latter being possessed of corresponding influence over him.

Ordinarily, a guardian is not authorized to exceed the income of his ward's estate in his expenditures for his maintenance and education. Yet, at the accounting and settlement between the parties, it is not shown that there was any reference, whatever, to the rule which forbids it. Nor does it appear, upon that occasion, that there was the slightest allusion made to the real value of the bank stocks, or the possible liabilities that might rest upon the holder, or to the actual amount recoverable upon the bond of Cannon, or the note of Heyward; or, above all, to the authority of the defendant, as executor or guardian, to make such investments, or investments in the bonds of the late Confederate States. The plaintiff

was left under the impression that the bank stocks were valuable; that the investments in them were conformable to his father's will, and that the note of Heyward, and Cannon's bond, represented a debt equal to the nominal sums specified on them. Such is the testimony of the plaintiff, and there is no reason to doubt its correctness. Such is the fair inference from the facts, as proved, independently of the plaintiff's testimony. Mr. Buist deposes that nothing was said about the actual value of the assets set down, and, at no stage of the settlement in question, was there any doubt suggested as to the authority of the defendant to invest his testator's moneys as he had done. So far from his being put upon his guard, and advertised, as he should have been, that he was engaged in a transaction irrevocable in its nature, the very opposite impression upon the plaintiff must have been produced by the declaration of Austin, "that, if there was anything wrong in the settlement, he would correct it." It does not appear to the Court that the plaintiff can be regarded as having consented to his alleged settlement with the defendant upon deliberate and "well informed consideration." If, therefore, by the release in question, he has relinquished any of his original rights without actual payment or satisfaction, he must be remitted to them and the release set aside.

On behalf of the plaintiff, it is urged that the defendant's investment in bank stocks, and in the bonds of the late Confederate States, were wholly unauthorized by his testator's will. The direction of the testator, to his executors, is to invest "in some safe public securities, in the stocks of the city of Charleston, or of the State of South Carolina." The stocks here designated seem to be stocks issued by the city of Charleston, in its corporate capacity, and stocks created directly and immediately by the State, both falling within the description properly of public securities. Such is the construction proposed by the plaintiff, and it is sustained. But, though the investments in question are held to be unauthorized by the terms of the will, it yet remains to be considered whether they have imposed a personal liability upon the executor.

According to the English decisions, an executor, though exercising reasonable care and diligence, will, in general, be responsible for all losses resulting from an unfortunate investment of his testator's funds, unless acting strictly within the line of his duty.— *Clough* vs. *Bond*, 3 Myl. and Cr., 496. "I have no doubt," says Lord Redesdale, "that the executor *meant* to act fairly and honestly, but he was misadvised. If, under the best advice he could

procure, he acts wrong, it is his misfortune, but public policy re-
quires that he should be the person to suffer."—*Doyle* vs. *Blake*, 2
Sch. and Lef., 243.    A rule less harsh and rigorous seems to be the
law of this State.    Our Courts have repeatedly adjudged that the
liability of trustees is not measured by the abstract rule of their
duty, but is to be determined by the inquiry whether there be evi-
dence of faithful endeavors to fulfill it.    A more rigorous rule, it is
said, would deter prudent and honest men, of ordinary capacity,
from accepting the appointment of trustee.—*Hext* vs. *Porcher*, 1
Strob. Eq., 170; *Boggs* vs. *Adger*, 4 Rich., 411.    In the case first
cited, the deed of marriage settlement was recorded in the office of
the Register of Mesne Conveyance for Beaufort District, and was
never recorded, as it should have been, in the Secretary of State's
office.    "The registration," says Chancellor Johnston, "though er-
roneous, is proof of a faithful intention to perform the duty re-
quired by law."    "I do not conceive," he adds, "that, to take ad-
vantage of a mistake committed in an evidently honest endeavor
by the trustee to perform his duty, and to make him liable for the
consequences, would either square with the dictates of justice, or
promote the true policy of the Court."

In the late case of *Martin* vs. *Jeffcoat*, 10 Rich., 118, the widow
of an intestate set up a claim to a family of negroes, which, says
the Court, were "unquestionably the property" of her deceased
husband.    The administrator, acting under the erroneous impres-
sion that she was entitled to them, surrendered the slaves, consti-
tuting almost literally the entire estate of the intestate, and they
were wholly lost to his children.    The widow's title to the negroes
she derived from the deed of her grandfather, Hoover.    Refer-
ring to the opinion prevailing in the neighborhood of the intestate,
that the negroes were not his, but her's, the Chancellor, who spoke
as the organ of the Court, observes : "Upon no proper construction
of that deed could such an opinion be supported."    "But," he pro-
ceeds, "there was much in the terms of Hoover's deed calculated
to mislead the common, uninstructed mind, and by which one un-
learned in law might arrive at anything but the right construction."

"The administrator," continued the Chancellor, "committed an
honest mistake.    He acted throughout in good faith," and it was
adjudged that he was not accountable for the value of the slaves in
question.

It cannot be maintained that the testator, in indicating the invest-
ments to be made by his executor, has expressed himself in terms

free from ambiguity. They are not unsusceptible of the construction that three descriptions of investments were contemplated : public securities generally, the stocks of the city of Charleston, and the stocks of the State of South Carolina. If the defendant, in reality, adopted this interpretation, then he was rid of the chief obstacle to the construction he seems to have given to the terms "stocks of the city of Charleston." By the stocks thus designated, he appears to have understood the testator as meaning not merely stocks of the city, in its corporate capacity, but stocks of incorporated companies, having their seat and place of business within the city limits. It has been already said that such construction is deemed to be erroneous ; but is it so clearly inadmissible that it could not have been really adopted by a man "of ordinary capacity" and "common, uninstructed mind, unlearned in the law?"

The will, as the bill alleges, was made in the city of Charleston, where the stocks of the People's and the Planters' and Mechanics' Banks are proved to have been "favorite investments of funds held by trustees and executors." Might not the executor, the defendant, rationally and naturally have understood his testator, by those words, as not intending to exclude the stocks of the city banks, which were generally and habitually preferred by persons having trust funds for investment? That such, in fact, was the construction of the testator's directions, adopted by both of his executors, is fairly to be inferred from the advertisement in 1861, over both their signatures, in one of the newspapers of the city. The "stocks wanted" and sought for by that advertisement, are stocks in the "Bank of South Carolina," the "People's Bank," and the "Planters' and Mechanics' Bank," and, "also, State and City Stocks." The defendant, although a shrewd business man, is no lawyer, and was at that time a broker, engaged in the purchase and sale of negroes. What was the calling or occupation of his co-executor, William W. Wilbur, does not appear. It can scarcely be supposed that at the date of the advertisement, and within two months next succeeding their testator's death, both executors, and, without purpose or motive, should concur in designing a willful breach of their trust.

No want of good faith in this transaction is imputed to Wilbur, yet he appears to be as much responsible for the loss sustained by the investment in the bank stock, as the defendant, Austin. Both proved the will, and on the same day qualified as executors, and the names of both are subscribed, as such executors, to the adver-

tisement referred to. The investments in the stocks of the People's, and Planters' and Mechanics' Banks, were actually made on the 12th and 19th September, 1861, and Wilbur, (say his executors in their answer,) "after an illness of over five weeks, departed this life on the 30th day of November, 1861." The inference, of course, is, that Wilbur co-operated and concurred in making those investments. Indeed, it is not left to inference, but appears positively and distinctly, by the bank book kept by Wilbur of the accounts between the Bank of South Carolina and himself and Austin, as executors of Womack, yet the bill alleges no liability incurred by Wilbur, and prays no relief against his executors in that behalf. There seems to be no stronger ground for imputing a want of fidelity to Austin than to Wilbur, in regard to the investments in the bank stocks. No motive of personal gain could have influenced them. The proof is, that the two banks, the People's, and the Planters' and Mechanics', " were regarded as the safest and best managed of all the city banks, were so reputed generally, and no better investment at that time could have been made, so far as men could then foresee."

If the will be construed to confer upon the executors the general power to invest in any safe public securities, then the defendant was authorized to invest in the bonds of the late Confederate States. There does not seem to have been any want of prudence and circumspection in making those investments, if warranted by the will. While the investments in the bank stock and Confederate securities referred to are considered to be unauthorized by his testator's will, yet the defendant is regarded as having acted in good faith, and in innocent mistake of his authority in that regard. In respect to those investments, nothing is perceived in the evidence, or the facts disclosed, inconsistent with faithful endeavors, on his part, to fulfil the duty that he had assumed, and for the loss which has resulted, it is held that no personal liability rests upon the defendant. Such is the conclusion attained, though with extreme diffidence, and much hesitation.

Cannon's bond, and Heyward's note are investments palpably unauthorized by the will, and could not have been regarded otherwise by the defendant. It is at the option of the plaintiff to accept or refuse them. If he rejects them, however, he cannot demand of the defendant such an amount of city or State stocks as might have been purchased with the aggregate of the sum specified in the note and bond referred to. But, in that event, he will be entitled to re-

cover no more than the aggregate of those sums of money, with interest.—Lewin on Trust., 341; *Shepherd* vs. *Monts*, 4 Hare, 500.

As already remarked, a guardian, in general, is not permitted to encroach upon the capital of his ward's estate. There are cases in which it will be allowed, and without a prior order from the Court, but the emergency must be great, and the expediency manifest.—*Prince* vs. *Logan*, Speer's Eq., 33.

The defendant's omission to make sale of certain of his testator's slaves may, perhaps, be justified, if the facts upon which he relies in that behalf be true. But, as they constitute matters of discharge and independent defence, they are not proved by the mere statements of the answer. The defendant should establish them by evidence, and the opportunity of doing so will be afforded upon the accounting to be had before the Master.

It is ordered and adjudged, that this opinion stand for the decree of the Court. And it is further ordered, that an account be taken by James W. Gray, Master in Equity, of the estate of John B. Womack, deceased, and of the administration of the same by his executors, Robert Austin and W. W. Wilbur, during the lifetime of said Wilbur, and, after his death, of its administration by the defendant and surviving executor, the said Robert Austin, and also of all moneys justly due and owing to the plaintiff, in this behalf, by the defendants, or any of them, conformably to the principles of this decree.

The complainant appealed from so much of the Chancellor's decree as exempts Robert Austin from liability for the loss of the money invested in the stocks of the "People's Bank," and the "Planters' and Mechanics' Bank," and in the three Confederate States bonds," and now moved this Court to reform the said decree, for the reasons:

*First.* Because the language of the will is plain and intelligible to the meanest capacity; and any other construction than the one given to it by the Chancellor, is so clearly inadmissible, that it could not have been really adopted by a "*man of ordinary capacity,*" and " *common, uninstructed mind, unlearned in the law* "— so the Chancellor has decreed; it, therefore, follows that, if Austin and Wilbur intended the two hundred and forty-four shares of bank stock as an investment for the complainant, their conduct was a palpable and deliberate breach of trust, the consequences of which should not fall on the complainant. But it is submitted that these

stocks were not originally purchased as a part of the twenty-two thousand dollars bequeathed to the complainant "when he attains the age of twenty-one years," but simply as a temporary invest-ment, to await the expiration of the year after the death of the testator, or a more convenient opportunity to convert everything into the stocks indicated by the testator. The death of Wilbur, so soon after, and before the estate could be settled, left Austin alone responsible for the loss.

*Second.* Because Austin, after he had purchased the bank stock, was advised by Mr. Buist, the Ordinary, who is also a lawyer, to seek State stock, as he, Mr. Buist, thought the testator's meaning somewhat ambiguous. and His Honor the Chancellor also seems to think it not entirely clear of ambiguity; but there certainly was no kind of doubt that Austin *was authorized* by the will to invest in stocks of the city of Charleston, "and the State of South Carolina," and that, by doing so, (as he readily could, as the witness said,) he would have fully satisfied the will, and incurred no risk, while it was certainly very doubtful, to say the least, whether he was au-thorized to buy any other kind of stocks ; yet he rejected the con-struction which was sure and safe, and adopted the one which was doubtful, and this without consultation, enquiry or advice; it is, therefore, insisted that he did not act in good faith.

*Third.* Because there was no evidence of any such precaution, on the part of Austin, either in reference to his investment in the bank stock, or in the Confederate States bonds, as a man of ordinary prudence and discretion would exercise in the conduct of his own affairs; and if His Honor's decree is right, that good faith, which will be presumed in the absence of proof showing bad faith, is suf-ficient to save a trustee or guardian from liability, then is the office of trustee or guardian the most irresponsible and the most desira-ble which one can hold.

*Fourth.* Because, if Austin acted in good faith, and really be-lieved he was carrying out the direction of the testator's will when he invested six thousand dollars in bank stock, (as the Chancellor has assumed,) it was in his power, at the trial of the case, by his own testimony, as his own witness, not only to prove it, but to ex-plain why he did not also invest the balance of the cash (about twelve thousand dollars) remaining in his hands, and the other moneys (amounting to near ten thousand dollars) received by him afterwards from sales, either in bank stocks or in city or State stocks.

*Fifth.* Because nothing short of the most reckless disregard for the interest of his ward can account for the conduct of a guardian who invests in the stocks of a private corporation, the charter of which subjects the holder to a liability to double the value of such stock. "The extreme diffidence and hesitation" of the Chancellor in deciding that Austin is not chargeable with the loss, is not, therefore, to be wondered at.

*Sixth.* Because, had this purchase of private bank stock been made in good faith, as a safe, permanent investment, to await the arrival of the complainant at maturity, it was competent for Austin to prove it by his oath as a witness on the trial; and it is a very significant fact, from which the most unfavorable inference may be drawn, that he did not, or would not, avail himself of the opportunity which the law allowed him to justify himself, and contradict or explain the facts which were testified to by the complainant.

*Seventh.* Because the complainant has the same right to elect between these bank stocks and the three Confederate States bonds, and the money they represent, that he has to elect between Heyward's and Cannon's papers, and their aggregate amounts of money, which the Chancellor admits and decrees. Besides which, the bank stocks carry with them a penalty which attaches to the holder of them; and, if Austin can shift it from his own shoulders on to the complainant's, by showing that, against the plain import of the will, he purchased the stock so encumbered for the complainant, then it is in the power of a guardian to ruin his ward, unless the ward has the right to elect when he shall come of age.

*Eighth.* Because, if the will can be so construed as to confer on the executors the "general power" to invest in *any safe public securities*, which is not admitted, the bonds of the late Confederate States were never, at any time, but especially at the time of the purchase, by Austin, of the three Confederate States bonds, safe public securities. They were never public securities at all, but were absolutely void in their inception; and the issuing of them, by a confederation of States, was a violation of the 1st Article, 10th Section, of the Constitution of the United States, and His Honor should have, therefore, decided such investments to be illegal and void.

*Ninth.* Because Austin's conduct was marked by fraud from the beginning to the end of his administration, and he has no claim to the favorable consideration of the Court.

Womack *vs.* Austin.

The defendant, Robert Austin, appealed from so much of the Chancellor's decree as opens the settlement made before the Ordinary:

Because, admitting the full force of the authorities shewing the suspicion with which the Courts regard settlements between guardian and ward, the uncommon shrewdness and intelligence of the ward in this case, his self-reliance, energy and fruitfulness of resource, developed by his soldier education and experience, during and after the war, together with his previous knowledge of the transactions of the guardian, and the fairness and candor exhibited at the time of the settlement itself, make this case exceptional, and forbid the idea of undue advantage, and the plea should have been sustained, and the bill dismissed.

Defendant also appealed from so much of said decree as throws Heyward's note and Cannon's bond upon defendant, inasmuch as the money invested by defendant, as guardian, was Confederate money, having become transmuted into this currency, without default on the part of the guardian, and, being so transmuted, nothing better could be done with it. It was in evidence that such paper as Heyward's note and Cannon's bond were, at that time, at a premium in the market, and to get it for Confederate money, at par, was then deemed a wise and sagacious arrangement.

Defendant also appealed from so much of the decree as suggests that the guardian, notwithstanding the settlement, may be charged with the excess of expenditure over the income. The great depreciation of the currency, and the character and condition of the times, illustrated in the item of $3,000 paid for a cavalry horse used by young Womack, fully account for any apparent extravagance in expenditure. Indeed, it does not appear that this is a point made by complainant, and his continued acquiescence is presumed.

The Chancellor does not notice the fact that the estate, before investment, consisted already of Confederate money, and that no public securities, except Confederate bonds, could be obtained, except by the payment of an enormous premium. The condition of the country and the currency warranted some departure from the terms of the will.

*DeTreville,* for plaintiff.

A deed, acquittance or release, by a ward to his guardian, three days after coming of age, is void, without proof of actual fraud.—*Waller* vs. *Armistead,* 2 Leigh, 11; *Hylton* vs. *Hylton,* 2 Ves., 548;

*Huguenin* vs. *Basely*, Part 2, Vol. 2, White & Tudor's Leading Cases, 38 ; *Wederburn* vs. *Wederburn*, 15 Eng. C. R., 722 ; *Johnson* vs. *Johnson*, 2 Hill's Ch., 286 ; *Mellish* vs. *Mellish*, 1 Sim. & Stuart, 138 ; *Roach* vs. *Harvey*, 1 Sim. & Stuart, 502 ; *Symonds* vs. *Walker*, 3 Swanston, 60 ; *Hatch* vs. *Hatch*, 9 Ves., 292 ; *Dent* vs. *Bennett*, 4 Mylne & C., 569 ; *Fish* vs. *Muller*, 1 Hoff. C. R., 267 ; *Rapalge* vs. *Noisworthy*, 1 Sandford C. R., 399 ; *Gale* vs. *Wells*, 12 Barb., 84 ; *Brewer* vs. *Vanartsdale*, 6 Dana, 204.

*Suppressio veri* or *suggestio falsi* is actual fraud, and will vitiate any transaction, without reference to the relation of the parties.—1 Story's E. J., §§ 186, 191, 192, 198, 218.

Misrepresentation, falsehood and concealment attended the settlement and release in this case.

It is the right of every legatee to reject a legacy coupled with a condition. The possession of bank stock subjects the holder to a liability.—12 Stat. at Large, 212, Act 1852; *Sacket's Harbor Bank*, vs. *Blake and Wife*, 3 Rich. Eq., 225.

Investment in bank stocks and Confederate bonds, a gross breach of trust.—Hill on Trustees, 368 ; 7 J. J. Marshall; *Smith* vs. *Smith*, 238 ; *Contee* vs. *Dawson*, 2 Bland, 264 ; 2d Part 2d Vol. W. & Tudor's Leading Cases, notes on pages 291, 292, 293 and 294.

On the death of Wilbur, all responsibility rested on Austin.— *Graham* vs. *Davis*, 2 Dev. & Bat., 155.

A trustee, or guardian, who violates the express directions of the paper which conferred the office on him, without imperative necessity, does so at his peril, and *prima facie* acts in bad faith.—2d Part 2d Vol. W. & Tudor's Leading Cases, notes 291 and 293 ; 1 Johns. Ch., 527, *Manning* vs. *Manning* ; *Coggs* vs. *Bernard*, 3 Lord Raymond.

Bank stocks are not public securities or proper as investments.— *Ackerman* vs. *Emmot*, 4 Barb., 319 : Hemphill's Appeal, 18 Penn. State Reports.

The liability of a trustee is to be measured by the abstract rule of his duty.—*Hext* vs. *Porcher*, 1 Strob., 170 ; *Boggs* vs. *Adger*, 4 Rich. Eq., 411 ; *Martin* vs. *Jeffcoat*, 10 Rich. Eq., 218 ; *Speer* vs. *Speer*, 9 Rich. Eq., 184; *Cooper* vs. *Day*, 1 Rich. Eq., 16 ; *Fraser* vs. *Fraser*, 7 Rich. Eq., 230 ; *Wood* vs. *Wood*, 5 Pages' Rep., 596 ; *Burnett* vs. *Sheil*, 2 Barb., 457, 459.

Bank stocks are neither public or private securities ; city stocks are. Confederate States bonds were not safe public securities.— Story on Constitution, 489, §§ 685, 694; A. A., 1861.

*Hayne*, for defendant.

1. The plea of defendant, as to release, should have been allowed and the bill dismissed.

The decree cites 1 Story Eq., § 317; *Hylton* vs. *Hylton*, 2 Ves., 548; *Huguenin* vs. *Basely*, 3 Lead. Eq. Cases, notes and cases cited. These and other cases, cited by complainant's counsel, express very strongly the suspicion and jealousy in regard to dealings between guardian and ward, executor and legatee, and others similarly situated during the continuance of the relation, or very recently after the dissolution.

*Hylton* vs. *Hylton* was the grant of an annuity; it was the grant that was set aside; the release and written discharge executed at the same time being allowed to stand. The transaction set aside was outside of a simple settlement. A speedy settlement, and release thereupon, come within the purview of the subsisting relation, and are not discouraged by the Courts. The suspicion and jealousy adverted to by the Chancellor will be found to attach to *extraneous dealings*, conferring on the guardian or trustee a substantial bounty or advantage. It is in such cases that the presumption arises that undue influence was exerted by the party benefitted. A release or discharge, in one sense, is a benefit; but are you, on that account, always to presume undue influence if the settlement is prompt? When would it be safe to settle? In *Hylton* vs. *Hylton*, the ward came of age April, 1746, and the transaction set aside was in October, 1747.

*Huguenin* vs. *Basely* does not apply; *Piese* vs. *Waring*, and others there cited, involve bounties outside a mere settlement. The principle, as laid down in the note of Eq. Leading Cases, Vol. 2, Part 2, p. 55, is as follows:

"*Huguenin* vs. *Basely* is a leading case on the very salutory jurisdiction of equity, to set aside, upon the principle of general public policy, *voluntary donations* obtained by persons standing in some confidential, fiduciary, or other relation towards the donor, in which dominion may be exercised over him."

Such a *gift* will be the more readily set aside, if, at the time of its being made, the guardianship accounts are not all settled, or the ward's property is retained by his guardian.

"In *Hatch* vs. *Hatch*, 9 Ves., 292, a guardian, who was incumbent of a living, obtained from his ward, soon after she became of age, a *conveyance of the advowson* of the living of which he was in-

cumbent, expressed to be made in consideration of her great friend-ship, kindness, and regard for him, the care taken of her by him, &c., Lord Eldon ordered the instrument to be delivered up to be cancelled.—*Extracts from Note on Huguenin* vs. *Basely."*

I take the ground that a simple release or discharge, given by a ward recently come of age, is not, as contended, *prima facie* invalid. On the contrary, it can be impeached only by *proof* of fraud or mistake, and *prima facie* is valid.

2. The validity of the release becomes, thus, not a question of law, but of fact. This question of fact has been passed upon by the Chancellor in favor of the guardian, and the Chancellor's decree in regard to the weight of evidence, if not conclusive, has, at least, the force of a verdict.

3. Certainly there is no such conclusion or preponderating testimony to establish fraud or mistake as would justify setting aside a verdict.

4. The settlement and release were proper in themselves.

*Campbell,* same side.

April 5, 1870. The opinion of the Court was delivered by

MOSES, C. J. We concur with the Chancellor in so much of his decree as disaffirms the release of February the 6th, 1866, and subjects the settlement, which it was intended to conclude, to examination and inquiry.

To avoid a discharge, executed by a ward to his guardian, shortly after he has reached his majority, it is not necessary that there should be proof of actual fraud. Even if full opportunity is afforded to examine the accounts, yet, without willful intent to mislead, there may be such a want of communication, both in regard to them and the securities transferred, as would preclude the Court from giving it effect as an estoppel.

There does not seem to have been any disclosure to the ward of the value of either the bank stock or the personal bonds, although, at the date of the proposed release, the plaintiff was well aware that the Confederate bonds were without any. He was not made acquainted with the fact that the bank stock carried with it such a possible liability, on the part of the holder, as might make it, if even then of any worth, the source of future loss. In *Walker* vs. *Lymonds,* 3 Swanst., 62, Lord Eldon said: "Concealment is of different natures:

an intentional concealment, and an actual concealment where there may be an obligation not to conceal, even if disclosure is not required." The very fact that the account of the receipts and expenditures exhibited a balance due the guardian, which he renounced, might have acted as an incentive to the release. The effect of a gift to the ward, under such circumstances, would be watched with jealousy by the Court. It is impossible to tell how it may have operated on the mind of a young man just of age, engaged in an adjustment of his affairs with one who had been selected by his father as a proper person to be entrusted with his education and moral training—one in whose family he had resided, and on whom he would naturally look with respect and regard. The very relation was likely to establish influences well calculated almost to enslave a youthful mind. The plaintiff, in his testimony, avers "that his affection for Austin had returned, and his confidence was restored, at the time of the settlement."

In *Wederburn* vs. *Wederburn*, 2 Keen., 722, 15 E. C. R., 722, the absence of such full information as guardians are bound to give was held sufficient to open a partial, but definite, settlement, after the lapse of many years, sufficient information not having been obtained till a short period before the bill was filed.

Did the plaintiff understand, or was he informed that, whatever part Mr. Buist took in the transactions, it was not in his official capacity as Ordinary ? He drew up the instrument, but does not remember that he read it to the plaintiff. Without any wrong intention by Mr. Buist or the defendant, Austin, the plaintiff may well have been mistaken as to the character in which he intervened in the matter, and concluded that, as the conference was in his office, and in his presence, and some of the papers read over or compared by him, he was officially supervising the settlement. The circumstances attending the transaction might well contribute to a conclusion, on the part of the plaintiff, that he was forfeiting no right by the execution of the instrument so prepared.

In *Revett* vs. *Harvey*, 1 Sim. & Stuart, 502, a release, executed by one who stood in the relation of ward, within a month after he came of age, and without the intervention of a friend or adviser on his part, for such reason was set aside.

In the case before us, although the instrument was not, in fact, executed until the second day, the defendant, Austin, never suggested to the plaintiff, to whom he was to submit his account, the propriety of having a friend or adviser, nor did he seem

to suppose it due to his own character and position that, in a settle-
ment with his ward, so recently of age, he should be represented
by some one of more experience ,than himself, who would not be
affected by the influence of the same feeling which it was probable
the plaintiff entertained towards him. It may be, that he felt so
satisfied of his own purpose to do exact justice, that it did not oc-
cur to him that something in that regard was due to the plaintiff,
whose judgment, by reason of his youth, must have been so imma-
ture that it stood in need of advice and aid in a matter, and on an
occasion, of so much importance to him.

It may have been that the defendant had a high estimate of the
ability of the plaintiff, and, therefore, did not regard such sugges-
tion necessary ; for he states, in his answer, that the "plaintiff is
exceedingly sagacious and intelligent, having been educated at the
State Military Academy, and being, during the war, sufficiently self-
reliant to elude the vigilance of the guard over the Confederate
prisoners at Elmira, in the State of New York, and escape there-
from to the South without capture or detection." The qualities re-
quired for an act of so much boldness and endurance may be of a
very different kind from those necessary for the protection of one's
interest in a settlement with a shrewd and keen business man.
Pooser, a witness introduced by the defendant, while he bore testi-
mony to the intelligence of the plaintiff, and his ability, as a youth,
to take care of himself, said that "Austin is a very shrewd busi-
ness man, and an overmatch for plaintiff at twenty-one."

Lord Hardwicke, in *Hylton* vs. *Hylton*, 2 Ves., Jr., 549, says:
"Where a man acts as guardian, or trustee in nature of a guardian,
the Court is extremely watchful to prevent that person's taking any
advantage immediately upon his ward or *cestui que trust* coming of
age, and at the time of settling account or delivering up the trust,
because an undue advantage may be taken. It would give an op-
portunity, either by flattery or force, by good usage unfairly meant,
or by bad usage imposed, to take such advantage." The question
there was in reference to an annuity granted to the guardian soon
after the ward arrived at age.

In the *Administrators of Johnson* vs. *The Executors of Johnson*, 2
Hill Ch., 286, the late Chief Justice O'Neall, in delivering the
opinion of the Court, says: "A guardian dealing with a ward just
after he has arrived at full age, and obtaining any beneficial con-
tract from him, or a release of the ward's rights, must, in order to
have it sustained, show its perfect fairness." In remarking on *Hyl-*

*ton* vs. *Hylton,* he observes: "That the same rule governs a release which is, in point of fact, a gift to the guardian of his arrears, and, unless the ward sees most clearly what he is about to do, it cannot be supported."

The proposition of the counsel of the defendant, that a release or discharge, given by a ward recently of age, is not *prima facie* invalid, may be conceded. If, however, the attendant circumstances render it valueless for the purpose proposed and contemplated by the party in whose favor it was executed, then, so far as these appear, they are first to be passed upon as questions of fact. The judgment of the Court is to be taken as a conclusion on them; and, in this view, the defendant would gain nothing from a review of the testimony, if, as he contends, "that the decree in regard to the weight of the testimony has at least the force of a verdict." If he can reverse the judgment of the Chancellor on the facts which induced him to disregard the release as binding, he must shew that the testimony, by an overbearing force, preponderated in his favor.

Concurring with the judgment of the Chancellor as to the release, we differ with him on his conclusions as to the bank stock and the Confederate States bonds.

However our cases may vary from the English authorities, as to the strictness by which a trustee is held to the line of his duty, and whatever favor may be extended to him, where loss ensues in spite of all "faithful endeavors" to prevent it, and however he may be held excused, by showing that he managed the fund "with the care of a prudent man," yet these interpositions in his behalf can only be claimed where the instrument under which he acts confers some discretionary power. Where it prescribes and directs certain investments, and it is in the competency of the trustee to make them, he is not at liberty, by substituting those of a different character, to create, in effect, a new deed, in the place of the one under which he accepted the trust. Chief Justice Dunkin, in *Snelling* vs. *McCreary,* 14 Rich. Eq., 300, says: "When left to his own judgment, the trustee must exercise his discretion in the manner in which a prudent man would in the management of his own affairs."

Where, however, the course which he is to pursue is dictated and directed by the authority which originates the trust, he is provided with a chart, from which he is not allowed to depart, unless forced by a necessity which he cannot resist.

The Chancellor, in his decree, sustains the construction of the words of the will proposed by the plaintiff, "that the stocks desig-

nated seem to be stocks issued by the city of Charleston, in its corporate capacity, and stocks created directly and immediately by the State, both falling within the description properly of public securities."

Suppose, however, that there was a doubt whether such bank stocks may properly be included under the term of "stocks of the city of Charleston," why did the defendant resolve that doubt against the expressed direction of the testator, who, in plain terms, referred to "safe public securities," and invest in those of private corporations? That they were favorite modes of investment in the city of Charleston might have protected him, if everything had been left to his discretion, but cannot avail to shield him from the responsibility he incurred when he transcended the duty so imperatively fixed by the will, with the opportunity before him of following its instructions.

· The evidence shews that, in 1861, when he so invested, State or city stocks could have been bought at or below par.. With this knowledge, he preferred not to follow the instructions of the will, and he must abide by the consequences.

The investment in Confederate bonds could not have been made before the 2d March, 1863, for they bear date on that day. It is not necessary to inquire whether "the safe public securities" referred to by the will were to be understood as limited to "the stocks of the city of Charleston or of the State of South Carolina." The Chancellor, in his decree, holds that "while the investment in the bank stocks and Confederate securities are considered to be unauthorized by the will, yet the defendant is regarded as having acted in good faith, and in innocent mistake of his authority in that regard."

According to the view which we have taken of the course of the defendant in relation to the bank stocks, this concession of want of authority to invest in Confederate bonds puts him in the position of a guardian failing in what he is directed, by doing that for which he was, without authority.

Measured even by the rule under which the decree concludes he must be exonerated, he will fail to find relief. Is there evidence of "faithful endeavors" to fulfill his duties? Would à prudent man, under the circumstances, have acted in the same manner? After his investment in bank stocks, it was suggested to him by Mr. Buist "that it would be best to invest in State or city stocks, as the words of the will were ambiguous." These stocks were at par, and the

conversion, even after that caution, could easily have been effected. Would a prudent man, in 1863, charged with an investment for another in "safe public securities," have sought Confederate bonds, as constituting securities of that character? They were the issues, not of a recognized Government, but of one endeavoring to assert and maintain its independence, by waging war against the United States, from which, by force of arms, it was attempting to maintain the withdrawal of the States which composed it. It was deficient in those elements of stability so essential and important to make its securities "safe," much less valuable.

It does not appear from what source the guardian received the Confederate money with which he says he purchased the Confederate and personal bonds, for the accounts have not been exhibited to us by either side, nor are they so referred to in the Circuit decree that we can ascertain it. Personal bonds, at best, are the securities the least preferred by Courts of Equity as investments. The authority to deal with them by this executor finds no warrant in the will which constituted him guardian, with instructions as to the conversion which he was to make of the money confided to him for his ward.

It is not proper that the question as to the effect of any expenditure by the guardian over the receipts for his ward should be now considered. If it arises on the account to be taken, it must first be passed upon by the Circuit Court.

It is ordered and adjudged, that so much of the decree of the Chancellor as sustains the investments in bank stocks and Confederate States bonds be reversed.

It is further ordered, that the case be remanded to the Circuit Court of Charleston County, with directions for an order by that Court that an account be taken of the estate of the said John B. Womack, deceased, and of the administration of the same by his executors, Robert Austin and W. W. Wilbur, during the lifetime of the said Wilbur, and, after his death, of its administration by the defendant, Austin, the surviving executor, and of all moneys justly due and owing to the plaintiff in this behalf by the defendants, or either of them, conformable to the principles of this decree.

*Willard*, A. J., concurred.